COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
NATALIE CLAGETT (SBN 351072)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlawgroup.com

SAN DIEGO COASTKEEPER
PATRICK MCDONOUGH (SBN 288285)
COURTNEY BROWN (SBN 360257)
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (619) 609-0860
Email: patrick@sdcoastkeeper.org

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, | Civil Case No.  **'25CV879 JO   DDL** |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| Plaintiffs, | |
| v. | **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |
| WEST COAST IRON, a California Corporation; | **(Unfair Competition Law – Unlawful Conduct under Cal. Bus. & Prof. Code § 17200 *et seq*.)** |
| Defendant. | |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.     JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.    On January 9, 2025, Plaintiffs issued a 60-day notice letter ("Notice Letter") to West Coast Iron, Inc. ("Defendant" or "WCI") as the owner and/or operator of the Facility located at 9302 Jamacha Road, Spring Valley, California 91977 ("Facility"), regarding its violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP," "Permit," or " Industrial General Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.    Plaintiffs mailed the Notice Letter to the Facility's physical address, 9302 Jamacha Road, Spring Valley, California 91977, and to Defendant's Agent for Service of Process at the same address via certified mail.

4.    Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5.    More than sixty (60) days have passed since the Notice Letter was served on

Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.    This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), because the state law claims are related to the federal claims and form part of the same case or controversy.

7.    Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

8.    Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

9.    Specifically, Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters and groundwater including Spring Valley Creek, the Sweetwater River, the San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

10.    Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

11.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

12.    Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the

food web between the producers (leaves, algae) and higher consumers such as fish.

13.    This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

14.    Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

15.    The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

III.    **PARTIES**

16.    West Coast Iron, Inc. is an active California Corporation and is the Owner and/or Operator of the Facility.

17.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    3

18.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

19.    Plaintiffs bring this action on their own behalf and on behalf of their adversely affected members. Plaintiffs' members (including citizens, taxpayers, property owners, and residents) live, work, travel, recreate, own property and homes, and reside in San Diego County. Plaintiffs' members use and enjoy the Receiving Waters for recreational, aesthetic, restoration, conservation, educational, scientific, professional, and other purposes.

20.    Plaintiffs and their members use and enjoy the Receiving Waters as well as the riparian, wetland, and beach areas adjacent to the waters for recreation and aesthetic activities like viewing wildlife. Plaintiffs and their members also engage in cleanup, restoration, and conservation activities in these waters as well as in the riparian, wetland, and beach areas adjacent to the waters. Additionally, the Plaintiffs and their members use these waters and adjacent riparian areas to engage in scientific study through pollution and habitat monitoring. They devote themselves to the study, protection, education, and conservation of the ecosystems, including species and wildlife and their habitats, that are impacted by the health of the waters into which Defendant's Facilities discharge polluted storm water.

21.    Given the ecological importance and aesthetic and recreational significance of the Receiving Waters, Plaintiffs' members use and enjoy these waters and surrounding ecosystems and wetlands for numerous activities. They frequently use various areas downstream from the Facility for hiking, biking, enjoyment of natural open spaces, general aesthetic enjoyment, bird watching, and observation of other fauna including butterflies, and various fish, reptiles, and mammals. Plaintiffs and their members have

conducted restoration and conservation activities including cleanups, invasive species removal, and native species planting, in multiple downstream locations. Plaintiffs and their members regularly lead ecological and educational tours in Receiving Waters and surrounding waters, wetlands, and riparian areas, including birdwatching tours and kayaking tours, educating members of the public about various flora, fauna, and ecosystems. Plaintiffs and their members also use these waters to engage in scientific study through pollution and habitat monitoring, including water quality sampling and assessment. Plaintiffs and their members plan to continue all of the aforementioned activities.

22. The discharge of storm water with elevated levels of pollutants from Facility reduces Plaintiffs' and Plaintiffs' members' use and enjoyment of those waters and the bays, beaches, and surrounding ecosystems and waters into which they flow. Defendant's discharges diminish Plaintiffs' and Plaintiffs' members' ability to use and enjoy these downstream waters and surrounding ecosystems for recreational, aesthetic, restoration, conservation, educational, professional, and scientific pursuits. Plaintiffs and their members are aware of the pollution concerns discussed herein, and based on these concerns avoid or limit touching, swimming, fishing, and engaging in other activities Receiving Waters when they would otherwise like to. The discharge of pollutants including toxic pollutants in storm water from the Facility harms aquatic life and species that live in the surrounding riparian habitat that Plaintiffs and Plaintiffs' members observe, study, consume, and contemplate spiritually.

23. The Facility's polluted discharges also degrade the surrounding riparian ecosystems and habitats that Plaintiffs and Plaintiffs' members work to protect and enjoy. Plaintiffs and their members have a vested interest in protecting and enjoying healthy ecosystems and thriving natural flora and fauna populations. Defendant's pollutant-laden storm water and non-storm water discharges thus diminish Plaintiffs' and Plaintiffs' members' use and enjoyment of the Receiving Waters. Plaintiffs' and Plaintiffs' members' reduced use and enjoyment of the Receiving Waters and impacted ecosystems

is directly traceable to Defendant's storm water discharges containing elevated levels of pollutants and unpermitted non-stormwater discharges.

24.     Accordingly, the legal violations alleged in this Complaint therefore cause direct injury to the recreational, aesthetic, restoration, conservation, educational, professional, and scientific interests of the Plaintiffs and Plaintiffs' members. Plaintiffs' and Plaintiffs' members' recreational, aesthetic, restoration, conservation, educational, professional, and scientific injuries are concrete and particular to Plaintiffs and each of their members who are adversely affected. Plaintiffs' and Plaintiffs' members' recreational, aesthetic, restoration, conservation, educational, professional, and scientific interests have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely and irreparably injured by the Defendant's failure to comply with the CWA. On information and belief, Defendant's discharges of storm water with elevated levels of pollutants are ongoing and will continue because Defendant has not corrected the poor practices that led to these pollutant-laden discharges and non-storm water discharges. These are actual, concrete injuries, traceable to Defendant's conduct, that would be redressed by the requested relief. If Plaintiffs are successful in this action, the Defendant will be required to bring their discharges from the Facility to waters of the United States into compliance with the CWA and thus reduce their discharges of pollutants to the affected receiving waters, and either eliminate or seek permit coverage for their non-storm water discharges. This would benefit Plaintiffs and Plaintiffs' members in reducing the identified harms that they currently suffer as a result of the Defendant's pollutant-laden storm water discharges and unpermitted non-stormwater discharges from the Facility.

25.     Plaintiffs have many members whose use and enjoyment of the Receiving Waters has been and continues to be harmed by Defendant's polluted discharges. Two such individuals are Laura Fuller and Rio Caramello-Uyeji.

26.     Rio Caramello-Uyeji is a member of Coastkeeper and its Operations Manager and started working for Coastkeeper in September 2023. She regularly walks,

hikes, bikes, and enjoys views and wildlife and native plants in and around the Receiving Water downstream from the Facility. She has engaged in these activities in multiple areas including the network of trails along near the mouth of the Sweetwater River, the San Diego Bay National Wildlife Refuge, the Living Coast Discovery Center, Chula Vista Bayside Park, and the bikeway along the Sweetwater River between San Diego Bay and the Plaza Bonita mall. She began regularly recreating in these areas in about 2018 and currently uses and enjoys these areas almost every week. She participated in the Bike the Bay event each year it has run since 2019. She participated in the biking and running segments of the Chula Vista Triathlon, but did not partake in the swim segment, due in part to her concerns about water quality and pollution in South San Diego Bay. Ms. Caramello-Uyeji is aware of, and concerned about, the many pollutant impairments and pollution burdens in the Sweetwater River and San Diego Bay. She is also aware of the Facility's pollutant discharges, which contribute to this pollution burden. At times she can smell odors from the waters, and she is concerned about the health of the wildlife, habitat, and ecology in these areas, all of which negatively impact her use and enjoyment. She also avoids contact water recreation such as kayaking due to these same concerns.

27.    Laura Fuller, a Coastkeeper member and Coastkeeper's Community Science Director, started working for Coastkeeper in May 2024. As part of her work for Coastkeeper, she regularly collects water quality samples at multiple locations across the region, including at the mouth of the Sweetwater River, directly in front of Pepper Park. These samples have shown high levels of copper and phosphorus, two of the many pollutants which the Facility has discharged at concentrations exceeding legal limits. She will continue to collect samples at this location every other month during 2025. In her previous employment as a research associate at the University of California, Davis Department of Environmental Toxicology, she spent eight field seasons collecting an annual sediment sample in the Sweetwater River, at the intersection of the river and Willow Street. These samples would be analyzed for toxicity parameters including heavy metals such as those discharged by the Facility. She enjoys viewing the National Wildlife

Refuge, and cares about the health of the Refuge and its resident flora and fauna. Ms. Fuller is aware of, and concerned about, the many pollutant impairments and pollution burdens in the Sweetwater River and San Diego Bay. In light of her education and experience, she has a deep understanding of the impacts of toxicity pollution, and is highly concerned about the health of the Sweetwater River and National Wildlife Refuge. She is also aware of the Facility's pollutant discharges, which contribute to this pollution burden. She wears personal protective equipment when sampling and avoids contact with this water she knows to be polluted. She would like to engage in contact recreation at the mouth of the Sweetwater River but avoids such activities due to her concerns about pollutant levels.

28.    Sara Ochoa is a member of CERF and serves as its Programs Director. She lives in Chula Vista and regularly recreates near Sweetwater River. Ms. Ochoa routinely takes her child to Rohr Park, adjacent to Sweetwater River and downstream of the Facility and its discharges. She has a deep appreciation for the birds, fish, and wildlife that depend on Sweetwater River and enjoys watching its resident flora and fauna. Ms. Ochoa would like to engage in greater contact recreation in and around Sweetwater River but avoids such activities due to her concerns about pollutant levels. She also discourages her minor child from engaging in such activities because of such concerns.

29.    Plaintiffs and Plaintiffs' members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

30.    Defendant's storm water pollution frustrates Plaintiffs' mission. Plaintiffs have diverted their limited resources to investigate, research, gather documents from regulatory agencies, and consult with experts in order to understand the extent of the harm Defendant's ongoing pollution causes in and around the Receiving Waters. Plaintiffs have dedicated substantial resources and time into its works and investigation regarding

Defendant's storm water pollution. At the time Plaintiffs undertook their investigation into the Facility, the resources spent were not related to any litigation. Plaintiffs would have used its limited resources on other matters had it not been for Defendant's conduct.

31.    Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

32.    The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

33.    The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

34.    An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

35.    The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

36.    Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

37.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

38.    "Waters of the United States" are defined as "navigable waters" and "all

1    waters which are currently used, were used in the past, or may be susceptible to use in

2    interstate or foreign commerce, including waters which are subject to the ebb and flow of

3    the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

4        39.    The EPA interprets waters of the United States to include not only

5    traditionally navigable waters, but also other waters, including waters tributary to

6    navigable waters, wetlands adjacent to navigable waters, and intermittent streams that

7    could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

8        40.    The CWA confers jurisdiction over waters that are tributaries to traditionally

9    navigable waters where the water at issue has a significant nexus to the navigable water.

10       41.    The CWA requires all point source dischargers, including those discharging

11   polluted storm water, achieve technology-based effluent limitations by utilizing the Best

12   Available Technology Economically Achievable ("BAT") for toxic and nonconventional

13   pollutants and the Best Conventional Pollutant Control Technology ("BCT") for

14   conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

15       42.    Private citizens may sue under the Clean Water Act to enforce the specific

16   provisions of California's Industrial General Permit. 33 U.S.C. § 1365(a)(1), (f)(6);

17   *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th

18   Cir.1998).

19   **B.    California's IGP.**

20       43.    Section 402(p) of the Clean Water Act establishes a framework for

21   regulating industrial storm water discharges under the NPDES permit program. It allows

22   each state to administer its own EPA-approved NPDES permit program for regulating the

23   discharge of pollutants, including discharges of polluted storm water.

24       44.    California is a state authorized by the EPA to issue NPDES permits. In

25   California, the State Board is charged with regulating pollutants to protect California's

26   water resources. Cal. Water Code § 13001.

27       45.    The IGP is a statewide general NPDES permit issued by the State Board

28   pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

46.     Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

47.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

48.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC code 3449 require coverage by the Permit. *Id*., Attachment A.

49.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.    The IGP Discharge Prohibitions.**

50.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this [Industrial] General Permit or another NPDES permit." *Id*. § III.A.

51.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

52.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

53.     The IGP prohibits discharges that violate any discharge prohibitions

contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

54.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

55.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.     The IGP Effluent Limitations.**

56.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

57.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

58.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

59.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see*

1  *also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

2      60.    Discharges from an industrial facility containing pollutant concentrations

3  that exceed EPA Benchmarks indicate the facility has not developed and/or implemented

4  BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa*

5  *Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

6      61.    Failure to develop or implement BMPs that constitute BAT and BCT is an

7  IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

8      **E.    The IGP Receiving Water Limitations**

9      62.    The IGP Receiving Water Limitation prohibits storm water discharges and

10  authorized non-storm water discharges from adversely impacting human health or the

11  environment. 2015 & 2020 Permits § VI.B.

12      63.    Storm water discharges with pollutant levels that exceed levels known to

13  adversely impact aquatic species and the environment are violations of the IGP's

14  Receiving Water Limitations. *Id.*

15      64.    The IGP Receiving Water Limitation prohibits storm water discharges that

16  cause or contribute to an exceedance of any applicable water quality standard contained

17  in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18  *Id.* § VI.A.

19      65.    Water quality standards ("WQSs") consist of both "designated uses" for a

20  body of water and a set of "criteria" specifying the maximum concentration of pollutants

21  that may be present in the water without impairing its suitability for designated uses. 33

22  U.S.C. § 1313(c)(2)(A).

23      66.    WQSs applicable to dischargers covered by the IGP include, but are not

24  limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants

25  for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan

26  WQSs must be attained at the point of discharge.

27      67.    The Basin Plan identifies designated "Beneficial Uses" for water bodies in

28  the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

68.     The Beneficial Uses for the Spring Valley Creek and the Sweetwater River include municipal and domestic supply; industrial services supply; contact water recreation; non-contact recreation; warm-freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

69.     The Beneficial Uses for the San Diego Bay include industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; estuarine habitat; migration of aquatic organisms; spawning, reproduction, and/or early development; shellfish harvesting; and rare, threatened, or endangered species. *Id*.

70.     The Beneficial Uses for the Pacific Ocean include industrial service supply; navigation; contact and non-contact recreation; commercial and sports fishing; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; marine habitat; aquaculture; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. *Id*., Table 2-3.

71.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

72.     According to the current 303(d) List of Impaired Water Bodies, Sweetwater River is impaired for benthic community effects, bifenthrin, chlorpyrifos, indicator bacteria, nitrogen, dissolved oxygen, phosphorus, pyrethroids, total dissolved solids, and toxicity. The Pacific Ocean shoreline near the San Diego Bay is impaired for indicator bacteria. California 2024 Integrated Report.

73.     Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

74.     The following WQSs are established by the Basin Plan for the Spring Valley Creek downstream of the Facility: iron, 0.3 mg/L and pH "shall not be depressed below

6.5 or raised above 8.5" in inland surface waters. Basin Plan at 3-21.

75.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQSs, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.    The IGP Storm Water Pollution Prevention Plan Requirements.**

76.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

77.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

78.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

79.     Dischargers must evaluate their SWPPP at least annually and revise it as

necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP requires dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

80.    The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id*. § XV.

**G.    The IGP Monitoring and Reporting Requirements.**

81.    Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id*. §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

82.    The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

83.    Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

84.    A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

85.    The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January

1 to June 30). *Id*. § XI.B.2.

86. Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

87. Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

88. Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

89. Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

90. Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

91. Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual Report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 and 2020 Permits, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

92. All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

V. **FACTUAL BACKGROUND**

A. **Facility Site Information, Industrial Activities, and Pollutant Sources.**

93. The SMARTS database indicates Defendant obtained IGP coverage to conduct industrial operations at the Facility on February 3, 2015, under Waste Discharge Identification ("WDID") Number 9 37I017861.

94.    The Facility's Standard Industrial Classification ("SIC") code is 3449 (Miscellaneous Structural Metal Work), which requires Industrial General Permit coverage.

95.    According to the Facility's SWPPP, the Facility is two acres, and two acres are exposed to storm water. Based on a CERF site inspection, approximately ninety-eight percent of the Facility is impervious, and thirty-five percent is exposed to storm water.

96.    Per WCI's website, the Facility conducts the following industrial activities: full, heavy, and miscellaneous steel fabrication and erection services. The website also indicates the Facility conducts various metal cutting, mitering, drilling, punching, tooling, sawing, scribing, and other types of steel processing. Although the SWPPP fails to acknowledge the vast majority of these industrial activities, it contains a one-page attached chart that enumerates the following industrial activities: general maintenance and upkeep, outside and inside production areas, oil, paint, and waste storage, and paint application. SWPPP at Attachment WCI Pollutant Source, Type, and BMP Matrix [hereinafter BMP Matrix].

97.    The Facility lists the associated pollutants as: motor and waste oil, transmission fluid, coolant, fuel, oil and grease, paint waste and dust, iron, copper, zinc, lead, aluminum, TSS, flammable waste, and wash water. *Id.*

98.    A sample of the Facility discharge obtained by CERF and Coastkeeper on February 1, 2024 shows the Facility discharges high concentrations of metals (1) metals such as iron, zinc, manganese, copper, and aluminum, (2) total suspended solids, (3) pH-affecting substances, and (4) nutrients such as nitrogen and phosphorus in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1.

99.    Storm water discharges from the Facility enter the County of San Diego municipal separate storm sewer system ("MS4"), and thereafter flow into the Spring Valley Creek, the Sweetwater River, the San Diego Bay, and the Pacific Ocean.

100.    The WCI property slopes slightly from the east to the west, with the eastern

neighbor sitting slightly higher in elevation. CERF observed that storm water flows from north to south through outdoor industrial areas and discharges out the driveway. This storm water then flows into the County MS4 curb drain inlet adjacent to the western side of the driveway.

101.    Industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

102.    Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

103.    Pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

104.    One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

105.    If regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

106.    Due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    19

107.    Industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the Facility and into storm water discharge points, which flow to Receiving Waters.

108.    Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

109.    Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

110.    The Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

111.    Elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

112.    Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

113.    Illegal discharges of polluted storm water and non-storm water from the Facility impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.    The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

114.    With every significant rain event, the Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

115.    The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

116.    Storm water and non-storm water discharges from the Facility violate the

Discharge Prohibitions and Effluent Limitations of the IGP.

### 1. Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.

117. The Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

118. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

119. "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

120. The Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters.

121. Storm water monitoring data collected by CERF on February 1, 2024, at the Facility's driveway, demonstrates the Facility has discharged, and continues to discharge, concentrations of (1) metals such as iron, zinc, manganese, copper, and aluminum, (2) total suspended solids, (3) pH-affecting substances, and (4) nutrients such as nitrogen and phosphorus, in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1. These polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

122. The West Coast Iron Pollutant Source, Type, and BMP Matrix ("BMP Matrix") suggests that water is used to wash equipment and vehicles. However, the SWPPP does not include any BMPs to prevent that water from discharging from the Facility and entering the storm drain. Thus, on information and belief, this water enters

the storm drain in violation of Discharge Prohibition III.B of the 2015 and 2020 Permits

123.    Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR. Coastkeeper and CERF's monitoring data of the Facility's discharge on February 1, 2024 shows concentrations of (1) metals such as iron, zinc, manganese, and copper, (2) pH-affecting substances, and (3) nutrients such as nitrogen and phosphorus, in excess of its respective Basin Plan Water Quality Objectives and CTR. *See* Ex. 1. Thus, the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

124.    Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

125.    "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

126.    Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

127.    Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

128.    The Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

129.    Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.B, III.C, and III.D of the Discharge Prohibitions provisions of the

IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

130.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

131.   The Facility has been in violation of these Discharge Prohibitions since at least January 9, 2019 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Ex. 1 (setting forth dates of all precipitation events during the past five years).

## 2.   Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

132.   Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

133.   BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Facility.

134.   Coastkeeper and CERF's storm water monitoring data indicate that the Facility's storm water discharges exceed the EPA Benchmarks for zinc, TSS, copper, aluminum, and N+N. For example, on February 1, 2024, the Facility discharged concentrations of copper at 72 μg/L, over 12 times higher than the EPA Benchmark of 5.9 μg/L. *See* Ex. 1. Thus, sampling data collected indicates that the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

135.   As discharges containing pollutant concentrations that exceed EPA Benchmarks indicate the Facility has not developed and/or implemented BMPs that meet BAT/BCT requirements, the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

136.   Visual observations and photographs of the Facility confirm that it lacks

BMPs that would achieve BAT/BCT. *See*, Ex. 1. For example, on February 1, 2024, a substantial number of rusty metal bars were stored outdoors, directly exposed to precipitation, lacking any shelter, covers, tarps, or other basic BMPs that would prevent pollutant exposure. Where few tarps were observed, they were haphazardly employed, such that significant industrial equipment and materials remained exposed to rain. Additionally, the significant number of workbenches and outdoor equipment suggests extensive outdoor industrial activity and a lack of preventative and/or cleanup measures. *See* Ex. 1.

137.    The Facility also failed to implement the BMPs listed in its own SWPPP. The BMP Matrix lists covering the racks as a BMP, but the Facility failed to implement this BMP during the observed rain event. *See* BMP Matrix. Additionally, the BMP Matrix indicates that WCI will "deflect storm water run-off from work area," yet on February 1, 2024, there were no barriers or structures in place that suggested any diversion or "deflection" of storm water away from the work area. The Facility's failure to implement many of its most basic BMPs during a recent rain event suggests the Facility routinely fails to implement the BMPs identified in its SWPPP Matrix.

138.    Such poor housekeeping and ineffective implementation of supposed BMPs fail to constitute BAT/BCT and cast doubt regarding the efficacy of other BMPs identified in the SWPPP. Thus, the Facility Owners and/or Operators have failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of the IGP.

139.    Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

140.    These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

141.    The Facility has been in violation of these Effluent Limitations since at least

1  January 9, 2019 and is subject to civil penalties for all violations of the Clean Water Act

2  occurring since that time.

3      **3.  Discharges of Polluted Storm Water from the Facility Violate IGP**

4          **Receiving Water Limitations.**

5      142.  The Facility has violated and continues to violate IGP Receiving Water

6  Limitations.

7      143.  The Receiving Waters are impaired, and thus unable to support designated

8  Beneficial Uses, for some of the same pollutants discharged by the Facility.

9      144.  Sweetwater River is impaired for nitrogen and phosphorus. Storm water

10  samples collected from the Facility on February 1, 2024 show concentrations of N+N at

11  1.9 mg/L, well over the Basin Plan objective of 1.0 mg/L for total nitrogen, and

12  phosphorus at 0.3 mg/L, also exceeding the Basin Plan objective of 0.1 mg/L. *See* Ex. 1.

13      145.  Sweetwater River is also impaired for low dissolved oxygen. Excess

14  concentrations of nutrients such as nitrogen and phosphorus can reduce levels of

15  dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such

16  toxins can move up the food chain. High nitrogen and phosphorus loading also results in

17  reduced spawning grounds and nursery habitats, fish kills, and public health concerns

18  related to impaired drinking water sources and increased exposure to toxic microbes. As

19  such, the Facility's polluted discharges cause and/or contribute to Sweetwater River's

20  dissolved oxygen, phosphorus, and nitrogen impairments.

21      146.  The Sweetwater River is impaired for toxicity. Zinc and copper are highly

22  toxic pollutants in aquatic environments, and limitations on such toxic pollutants are

23  specifically enumerated in the CTR. The Facility's discharges of these toxic metals in

24  excess of the CTR standards cause and/or contribute to the toxicity impairments of the

25  Sweetwater River. *See* Ex. 1.

26      147.  The Sweetwater River is impaired for benthic community effects. The San

27  Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable

28  solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."

"Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development. As such, the Facility's discharge of high levels of TSS cause and/or contribute to the benthic community effects impairment of the Sweetwater River. *See* Ex. 1.

148.    The Sweetwater River is also impaired for total dissolved solids ("TDS"). Iron, manganese, and nitrates can contribute to high TDS. As such, the Facility's discharges of high concentrations of iron, manganese, and nitrates, in excess of the Basin Plan objectives, causes and/or contributes to the TDS impairment of the Sweetwater River. *See* Ex. 1.

149.    The Basin Plan and CTR are applicable WQSs under the IGP.

150.    Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020 Permits § VI.A.

151.    Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

152.    Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP.

153.    The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

154.    The Facility has been in violation since January 9, 2019.

/././

/././

### 4. Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.

155. Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

156. The Facility is currently operating without a valid SWPPP.

157. The Facility SWPPP and site map fail to accurately reflect on-the-ground site conditions.

158. WCI has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, and the subsequent discharge of pollutants from the Facility, in violation of the IGP.

159. WCI has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, and the subsequent discharge of pollutants from the Facility, in violation of the Industrial General Permit. Generally, the SWPPP is practically nonexistent. It consists of two pages, the first being a table of contents and the second, a bare chart. The SWPPP omits or glosses over many required elements. The numerous violations described in this Section are a non-exhaustive, illustrative list.

160. The SWPPP fails to note all industrial activities that occur onsite to effectuate its metal work. The SWPPP only alludes to the following activities: vehicle and equipment maintenance, painting, scrap metal as a production byproduct, metal manipulation, loading and unloading, waste and material storage, dust-generating activities, and equipment washing, without identifying where the activities occur or any providing any narrative description. SWPPP at BMP Matrix. Further, for the dust-generating activities, the SWPPP must designate and implement BMPs for the activity; however, the SWPPP fails to identify the specific industrial activity that produces dust or corresponding BMPs.

161. The enumerated industrial activities are not comprehensive. The SWPPP fails to identify many metal working activities such as metal cutting, mitering, drilling,

1  punching, tooling, sawing, and scribing, as well as common industrial activities for such
2  a Facility, like shipping and receiving various materials, waste disposal, or other common
3  industrial activities. *Id.*

4      162.    The SWPPP fails to contain a list of all industrial materials on site and
5  where the materials are stored, received, shipped, or handled. *Id.* For the few industrial
6  materials named on the BMP Matrix, these industrial materials are inadequately
7  described as the BMP Matrix excludes their type, characteristics, and approximate
8  quantities. For example, WCI alters and manufactures steel beams or bars; however, the
9  SWPPP and BMP Matrix neglect to make any mention of steel, much less the quantity or
10  form of the steel utilized at the Facility. With respect to equipment washing, the SWPPP
11  concedes washing occurs onsite but fails to identify the equipment washed or where it is
12  stored, cleaned, and maintained, or how equipment byproducts may be discarded. The
13  BMP Matrix fails to provide the requisite information for the industrial materials
14  accompanying the activities.

15      163.    WCI uploaded a hazardous waste list. This list was not included in the
16  SWPPP, was not comprehensive, and is not a substitute for a SWPPP.

17      164.    The SWPPP also fails to adequately analyze the pollutants associated with
18  the industrial activities and materials. For example, steel is a common industrial material
19  used at the WCI Facility. Steel contains many metals like iron, manganese, chromium,
20  nickel, titanium, and copper, and sometimes contains phosphorus. Nonetheless, the BMP
21  Matrix only acknowledges the presence of iron and copper. *Id.*

22      165.    The SWPPP mentions the possibility of spills and leaks, yet the SWPPP
23  does not clarify whether any spills or leaks have occurred within the past five years and
24  associated details. *Id.* The SWPPP also does not list spill and leak prevention procedures
25  or what equipment may leak. Similarly, the Facility fails to denote any preventative
26  maintenance for the equipment on site. The SWPPP also states that the Facility has
27  erosion-vulnerable areas that may interact with storm water yet does not give an adequate
28  location description of these areas.

166.   Because the Facility fails to list all the industrial activities and associated pollutants, the SWPPP likewise fails to identify and implement BMPs that account for those activities. Indeed, the SWPPP lacks an adequate BMP section. The SWPPP lists various BMPs in the BMP Matrix Table, but fails to identify BMP frequency, time of day, location where the BMP would be implemented, or condition that may trigger the BMP.

167.   Further, the SWPPP must identify the person responsible for executing the BMP and metrics for evaluating the efficacy of the BMP. Designating a responsible person helps to ensure that the BMPs are implemented.

168.   The Facility site map remains woefully defective, failing to acknowledge substantial outdoor storage, including but not limited to rusty beams and pipes, outdoor tools, ladders, and workbenches that hold rusty beams. *See* Ex. 1. The map fails to identify the waste disposal areas, the drainage flow, all discharge and sampling locations, shipping and receiving areas, fueling locations, all covered and uncovered storage areas, wash-down areas for equipment, material handling locations, and areas of dust-generating activity. The map also must dictate the location of storm drain inlets but fails to do so. For example, the Facility has a drain adjacent to the driveway that is not indicated on the map.

169.   The Facility also fails to indicate the Receiving Water in the SWPPP. Indeed, the NOI leaves that line blank and the SWPPP likewise fails to mention the Receiving Waters.

170.   The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the IGP. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. Despite the significant concentrations of pollutants in the Facility's storm water discharges, and the copious amounts of outdoor storage, information available to Coastkeeper and CERF indicates the Facility SWPPP has remained virtually the same since at least its initial upload in 2015 and is dated August 2003, and has not been revised

to include additional BMPs to eliminate or reduce pollutants in the Facility's storm water discharges, as required by the Permit.

171.    Defendant has operated the Facility since at least January 9, 2019 without a valid SWPPP. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act. Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least January 9, 2019.

172.    These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**5.    Defendant Has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan at the Facility.**

173.    Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

174.    The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a MIP that provides for the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP.

175.    The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit. Facilities with the SIC code 34XX, like WCI, are required to sample for zinc, N+N, iron, and aluminum, in addition to the parameters required for all facilities (TSS, oil and grease, and pH). Further, the SWPPP also enumerates lead and copper as potential pollutants, and thus the IGP requires the Facility to also sample for those parameters.

176.    Coastkeeper and CERF's storm water sampling found high concentrations of manganese and phosphorus in excess of water quality standards. These pollutants stem from the Facility's many outdoor industrial activities. WCI's failure to include these parameters in the Facility's MIP is an ongoing violation of the Permit.

177.    The Facility Owners and/or Operators have failed and continue to fail to

collect the required number of storm water samples for each reporting period. The IGP requires Facilities to collect four samples each reporting period. However, since at least 2019, the Facility has not collected the required number of storm water samples. *See* Ex. 1, Table 1. WCI's failure to collect the required number of storm water samples during each reporting period has resulted in numerous ongoing and continuous violations of the IGP.

178.    Further, the Facility always uploads its (incomplete) sampling data reports just before the Annual Report is due. However, the IGP requires the Facility to upload the reports within 30 days of obtaining the results.

179.    On information and belief, the Facility has failed to collect storm water samples and obtain data that accurately reflects the quality of the discharge.

180.    The IGP requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. On information and belief, including the Facility's repeated violations of Discharge Prohibitions and Effluent Limitations, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

181.    Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

182.    Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least January 9, 2019.

183.    These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least January 9, 2019.

### 6.  Defendant Has Violated the IGP's Reporting Requirements.

184.    Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

185.    The Facility Owners and/or Operators have submitted multiple annual reports that were certified attesting to the Facility's compliance with the terms of the IGP.

However, information available to Coastkeeper and CERF indicates that these certifications are erroneous.

186.   The Facility has and continues to violate numerous provisions of the IGP. The Facility's Legally Responsible Person (LRP) knew or should have known the Facility failed to comply with numerous procedural and substantive provisions of the IGP, and thus certifications of these annual reports were erroneous.

187.   In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this IGP, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits § XXI.N.

188.   Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

189.   Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least January 9, 2019.

190.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since January 9, 2019.

## VI.    CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

191.   Plaintiffs incorporate the allegations contained in the above paragraphs as

though fully set forth herein.

192.    Defendant has discharged and continues to discharge unauthorized non-storm water discharges in violation of discharge prohibition III.B of the 2015 and 2020 Permits.

193.    Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

194.    Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

195.    The Basin Plan states: "[t]he discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with applicable receiving water quality objectives, is prohibited." Basin Plan, p. 4-30.

196.    The Regional Board has not made an allowance for dilution of WCI's storm water discharges.

197.    "Where consideration of a dilution allowance or mixing zone is not permitted by the water quality standards or is not appropriate, the relevant water quality criterion must be attained at the point of discharge." U.S. EPA's NPDES Permit Writer Manual § 6.2.3.

198.    Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited.

199.    Chapter 3 of the Basin Plan confirms the CTR is a "water quality criteria" that applies to California inland surface waters, enclosed bays, and estuaries. Basin Plan at 3-34, 3-35.

200.    The CTR sets forth continuous and maximum levels for numerous toxic pollutants, in both freshwater and saltwater environments. *See* 40 C.F.R. § 131.38.

201.    In adopting the CTR, the EPA expressly directed that "[a]ll waters

(including lakes, estuaries and marine waters) . . . are subject to the Criteria promulgated today. **Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone."** (Emphasis added) (65 FR 31682-01).

202.    The EPA further directed that "[t]hese Federal Criteria are legally applicable in California . . . for all purposes and programs under the Clean Water Act." *Id.*

203.    Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least January 9, 2019 to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

204.    Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 9, 2019 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

205.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

206.    Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

207.    Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

208.    Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

209.    Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

210.    Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from at least January 9, 2019 to the present. Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

211.    Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

212.    Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since January 9, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in of Unfair Competition Law, Cal. Bus. & Prof. Code §17200.**

213.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

214.    The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

215.    Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

216.    Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

217.    Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

218.    In addition to being waters of the United States, the Receiving Waters are waters of the State of California.

219.    Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"). Cal. Water Code §§ 13350(a), 13263(a).

220.    Defendant's violations of the Porter-Cologne Act and the General Permit each constitute unlawful conduct under Cal. Business and Professions Code Section 17200.

221.    Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs, discharge from the Facility.

222.    Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from January 9, 2020 to the present. Defendant's violations of the IGP Receiving Water Limitations and the Portor-Cologne Act are ongoing and continuous.

223.    Defendant will continue to be in violation of the IGP and the Porter-Cologne Act each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

224.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Cal. Business and Professions Code Section 17200.

225.    Defendant is a person under Cal. Bus. & Prof. Code § 17201.

226.   Plaintiffs and their members have been and will continue to suffer injury and harm as a result of Defendant's unlawful conduct. Plaintiffs have suffered injury in fact and monetary harm because they have dedicated resources to investigating and stopping Defendant's conduct that would not have been necessary but for Defendant's illegal actions and which could have been used on other matters.

227.   For example, on February 1, 2024, Plaintiffs diverted staff resources to obtain a sample of the Facility's storm water discharge and paid $441.25 to a certified lab to examine the sample for the presence of pollutants.

228.   Defendant's ongoing pollution of heavy metals and other pollutants into the Receiving Waters frustrates Plaintiffs' mission.

229.   This Court has jurisdiction to enjoin Defendant's unlawful conduct that violates Cal. Water Code § 13350(a), 13263(a) under Business and Professions Code Section 17203.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

230.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

231.   Defendant has failed and continues to fail to develop and/or implement an adequate SWPPP for the Facility.

232.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

233.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

234.   Defendant has been in violation of the IGP SWPPP requirements at the

Facility every day from at least January 9, 2019, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

235.    Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

236.    Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since January 9, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

237.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

238.    Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

239.    Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

240.    Defendant has been in violation of the IGP MIP requirements every day from at least January 9, 2019, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

241.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

242.    Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions

1  alleged above, Defendant is subject to an assessment of civil penalties for each and every
2  violation of the CWA occurring since January 9, 2019. 33 U.S.C. §§ 1319(d), 1365, and
3  40 C.F.R. § 19.4.

### SIXTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the IGP.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

243.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

244.    Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

245.    Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

246.    Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

247.    Defendant has failed and continues to fail to upload its monitoring reports late in violation of the IGP and CWA. 2015 & 2020 Permits § XI.B.11.a.

248.    Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least January 9, 2019. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

249.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

250.    Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil

penalties for each and every violation of the CWA occurring since January 9, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Report as Required in Violation of the IGP and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

251. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

252. Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

253. Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also* 33 U.S.C. § 1311(b).

254. Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least January 9, 2019. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

255. Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

256. Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since January 9, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VII.   RELIEF REQUESTED

257. Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendant has violated and continues to be in violation of Sections 13263(a) and 13350(a) of the Porter-Cologne Act, Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants

1    from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA,

2    33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent

3    limitations which include BAT/BCT requirements, and for failing to comply with the

4    other substantive and procedural requirements of the IGP as set forth within this

5    Complaint;

6        b.    A court order enjoining Defendant from discharging pollutants from the

7    Facility to surface waters in violation of the Clean Water Act, Porter-Cologne Act, and

8    IGP;

9        c.    A court order requiring Defendant to implement affirmative injunctive

10   measures designed to eliminate Defendant's violations of the substantive and procedural

11   requirements of the IGP, Porter-Cologne Act, and the Clean Water Act;

12       d.    A court order assessing civil monetary penalties for each violation of the

13   CWA at $68,445 per day per violation for violations that occurred after November 2,

14   2015 and assessed on or after January 9, 2025; 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

15       e.    A court order awarding Plaintiffs their reasonable costs of suit, including

16   attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

17   Water Act, 33 U.S.C. § 1365(d); and

18       f.    Any other relief as this Court may deem appropriate.

19   Dated: April 14, 2025

20                                            Respectfully submitted,
                                              COAST LAW GROUP LLP
21                                            By: s/Livia B. Beaudin
                                              LIVIA B. BEAUDIN
22                                            Attorney for Plaintiffs
                                              COASTAL ENVIRONMENTAL
23                                            RIGHTS FOUNDATION
24                                            E-mail: livia@coastlawgroup.com

25                                            SAN DIEGO COASTKEEPER
                                              By: s/Patrick McDonough
26                                            PATRICK MCDONOUGH
                                              Attorney for Plaintiffs
27                                            SAN DIEGO COASTKEEPER
28                                            E-mail: patrick@sdcoastkeeper.org

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    41